**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **JERROD SMITH,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **NO. 3:19-cv-00600** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION AND ORDER

Jerrod Smith was convicted of conspiracy to commit mail fraud, mail fraud, and obstruction of justice in 2018. A jury found he and his co-conspirator falsified drug pedigree documents, dealt with unlicensed drug suppliers, and fraudulently sold prescription medications through their pharmaceutical wholesale company, Cumberland Distribution ("Cumberland"). Mr. Smith received a 180-month sentence. He filed a pro se petition to vacate that sentence under 28 U.S.C. § 2255, alleging his trial attorney, Thomas Kendrick, was ineffective. (Doc. No. 1). Mr. Smith later retained counsel and filed an amended petition that incorporated and expanded upon his pro se petition. (Doc. No. 11). Mr. Smith's claim has been fully briefed (Doc. Nos. 16, 42, 43, 47, 48), and the Court held an evidentiary hearing regarding it (Doc. Nos. 40, 41). The Court will deny Mr. Smith's request for relief.

## I. BACKGROUND[1]

### A. Mr. Smith's Professional History and Criminal Proceedings.

In 2007, Mr. Smith and Jeffrey Edwards co-founded Cumberland. (Doc. No. 1 at 1). They

---

[1] The Court did not find Mr. Smith credible at the evidentiary hearing, as outlined in Section I.B. Accordingly, the Court relies primarily on exhibits and other witnesses' testimony for its factual findings on disputed issues. On certain undisputed issues, it relies on information from Mr. Smith.

each owned half of the equity in the company.  (Id.).  Mr. Smith served as President of Cumberland, whereas Mr. Edwards served as its Chief Executive Officer.  (Id.).  Mr. Edwards' wife, Brenda, also worked at Cumberland.  (Id. at 2).  She assisted with product procurement.  (Id.).

Around 2008, the Food and Drug Administration ("FDA") started an investigation into Cumberland.  (Doc. No. 41 at 99).  The investigation was headed by Special Agent Bob West. (Id.).  The FDA suspected that Cumberland was "buying drugs off the street in Miami [and] in New York, repurposing them, and putting them back into the wholesale market and distributing those to pharmacies throughout the United States."  (Id. at 99–100).

In May 2009, as part of its investigation, the FDA raided a Cumberland warehouse.  (See Doc. No. 1 at 2).  It seized computers, files, and company inventory.  (Id.).  In September 2009, Mr. Smith and Mr. Edwards agreed to meet with the government in a proffer session to discuss its investigation.  (Id.).  Both men were represented by Anthony Osso at the time.  (Id.).  According to a government interview memorandum, during the proffer session, Mr. Smith stated that he "did not trust" the drugs coming to Cumberland from one of its suppliers, "however, he distributed them anyways."  (Ex. 2).[2]  The memorandum was written by Agent West.  (Id.; Doc. No. 41 at 102).

Subsequently, Mr. Smith retained Jennifer Thompson as his independent counsel.  (Doc. No. 41 at 8).  In April 2010, assisted by Ms. Thompson, Mr. Smith attended a second proffer session with Agent West.  (Doc. No. 11 at 11).  Mr. Smith made inculpatory statements during the interview.  (Doc. No. 41 at 14).  According to an interview summary written by Agent West, Mr. Smith "admitted that he knew the drugs coming to Cumberland were being obtained from

_____

[2] The Court refers to the parties' exhibits from the evidentiary hearing in this matter in the following form: "Ex. __."

2

illegitimate or unscrupulous sources. He also acknowledged that he knew what they were doing was illegal in the fact that the drugs being shipped to . . . independent pharmacies could not be verified since he and others knew the drugs were coming from unlicensed wholesalers." (Ex. 4).

After the proffer session, Ms. Thompson told Mr. Smith that the government "was going in the direction of wanting [him] to plead guilty." (Doc. No. 41 at 63). She talked to the government about resolving the case pre-indictment. (Id. at 136). The government drafted a plea agreement and sent the draft to Ms. Thompson. (Id. at 137; Ex. 7). The plea agreement recommended an offense level for Mr. Smith of 35.[3] (Ex. 7 at 9). It stated that the parties had no agreement regarding Mr. Smith's criminal history category. (Id.). But even at the lowest possible criminal history category, an offense level of 35 would have corresponded to a sentencing guidelines range of 168–210 months of imprisonment.[4] The agreement also contemplated that the government might file a U.S.S.G. § 5K1.1 motion on Mr. Smith's behalf. (Id. at 11–12). According to Ms. Thompson, the government was "willing to take 50 percent off" based on Mr. Smith's cooperation. (Doc. No. 41 at 129).

Ms. Thompson spoke to Mr. Smith about the plea offer. (Id. at 138–39). She advised him to plead guilty and cooperate. (Id. at 140). Mr. Smith did not accept her advice. He told her "I really don't want to serve any prison time." (Id. at 138). He fired her in April 2011 (Ex. 11) and

---

[3] This level assumed a two-level reduction for acceptance of responsibility and a one-point reduction for Mr. Smith's timely notice of his intent to plead. (Ex. 7 at 8). Absent those reductions, the plea agreement would set the offense level at 38. (Id.).

[4] The Court has taken judicial notice of the Sentencing Guidelines effective as of November 1, 2010. See Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). That is the version of the Sentencing Guidelines contemplated in the draft plea agreement. (Ex. 7 at 7).

stated in a power of attorney document that "her goals in the case do not appear to coincide with mine" (Ex. 12). Mr. Smith replaced Ms. Thompson with Mr. Kendrick. (Id.).

Mr. Smith's first meeting with Mr. Kendrick was a "group meeting at his office." (Doc. No. 41 at 21). In addition to Mr. Smith and Mr. Kendrick, two acquaintances of Mr. Smith—Tom Lane and Gene Morrison—were present. (Id.). During the meeting, the four men discussed Mr. Smith's role at Cumberland, his criminal case, his proffer session with the government, and the pharmaceutical distribution business. (Id. at 21–22). Mr. Smith claims he admitted he "was culpable" during that meeting. (Id. at 23). However, the record contradicts that statement; it appears Mr. Smith told Mr. Kendrick he was innocent.[5] Mr. Kendrick's intake memorandum for Mr. Smith's case says that Mr. Smith "at no time had any knowledge that anything was wrong about the business dealings of Cumberland and still does not know that there was anything wrong about such dealings." (Ex. 31 at 4). And an email Mr. Kendrick sent to a colleague years later, in 2018, indicates Mr. Smith consistently told Mr. Kendrick he was innocent throughout their relationship. (Ex. 23 at 1 ("The real bottom line is that I cannot plead a client guilty unless he is guilty. My client insists, and has insisted since 2011, that he is not.")).

Based in part on the information discussed at the initial meeting, Mr. Kendrick formed a trial theory of Mr. Smith's case. (Doc. No. 41 at 23). He believed "Agent West . . . was not 100 percent credible and that . . . they could punch holes in any type of statement that he gave." (Id. at 23–24). At some point after the meeting, Mr. Kendrick asked Mr. Smith to "write any thoughts or discrepancies that [he] might have" regarding Agent West's summary of Mr. Smith' 2010 proffer. (Id. at 26). Mr. Smith did so. (Ex. 13). In August 2012, he sent Mr. Kendrick a document

---

[5] Notably, Mr. Smith did not call any witnesses to verify his claim that he told Mr. Kendrick he was guilty even though, based on Mr. Smith's testimony, Mr. Lane and Mr. Morrison should be able to verify that claim.

in which he had made forty handwritten notes on the five-page summary. (Id.). The notes claimed Mr. Smith had not made nearly all of the incriminating statements attributed to him by Agent West in the summary. (Id.).

In addition to speaking with Mr. Smith, Mr. Kendrick conducted an independent investigation into the case. He met with Agent West and several other witnesses. (Ex. 26; Doc. No. 41 at 110). He reviewed evidence the government provided. (Doc. No. 41 at 110–111, 116). And he engaged a private investigator, Jim Lynch,[6] to work on Mr. Smith's case. (Id. at 33).

In January 2013, the government indicted Mr. Smith, Mr. Edwards, and Mrs. Edwards. Indictment, United States v. Edwards, et al., Case No. 3:13-cr-00012 (M.D. Tenn. Jan. 17, 2013), ECF No. 3.[7] In response, Mr. Kendrick met with Mr. Smith. (Doc. No. 41 at 30). Mr. Kendrick discussed the sentencing guidelines for each of Mr. Smith's charges. (Id. at 30). He also discussed the possibility of negotiating a plea deal for Mr. Smith. (Id. at 30–31). However, Mr. Kendrick believed they "didn't need to make a decision right then and there" about pursuing a plea. (Id. at 31).

Instead, according to Mr. Smith, Mr. Kendrick wanted to focus on another strategy. (Id. at 33). He "thought [he] could get [the] case dismissed," either because the government did not have "sufficient evidence" or because Mr. Lynch might be able to arrange some sort of "barter or trade" with the government. (Id. at 33–34). Mr. Smith has expressed some confusion over the role Mr. Lynch played. (Id. at 33 ("[A]ll of this is kind of -- kind of over my head.")). But he has the impression Mr. Lynch "knew people from, like, DEA agencies, and could help them with cases in

---

[6] Mr. Lynch apparently also went by the name "Bill Lyons." (Doc. No. 41 at 33).

[7] Hereafter, references to this case are made in the following form: "Edwards, et al., Case No. 3:13-cr-00012, ECF No. __."

exchange for helping him with other cases that he was working on." (Id.). Mr. Smith had reason to believe in Mr. Kendrick's ability to get his case dismissed because "some clients that Kendrick had that [Mr. Smith's] family was aware of . . . were successful in getting their case[s] dismissed" and "Lynch had had success in other cases that he had worked with Tom Kendrick." (Id. at 34).

Mr. Kendrick also had a backup strategy. He informed Mr. Smith that "[i]f this doesn't work out with what . . . Jim Lynch is doing, if we can't get this case dismissed, then [he was] always prepared to go to trial." (Id. at 36). In the event they went to trial, Mr. Kendrick planned to argue that the government could not satisfy all the elements of the crimes with which Mr. Smith was charged. (Id. at 41). In particular, he planned to impeach the credibility of the government's witnesses. (Id. at 71; Ex. 23). And he planned to argue Mr. Smith lacked the "intent" element of his alleged crimes. (Doc. No. 40 at 11).

In May 2014, the Edwards pled guilty. Edwards, et al., Case No. 3:13-cr-00012, ECF Nos. 140, 143. They agreed to cooperate with the government against Mr. Smith. (Doc. No. 41 at 43). Roughly four months later, Mr. Kendrick filed a motion to dismiss, which the trial court denied. Edwards, et al., Case No. 3:13-cr-00012, ECF Nos. 161, 163. Mr. Kendrick later filed a second motion to dismiss in May 2015. Edwards, et al., Case No. 3:13-cr-00012, ECF Nos. 193, 197.

According to Mr. Smith, "early on" in 2014 or 2015, he "lost faith" in Mr. Kendrick's strategy to try to get the case dismissed using Mr. Lynch. (Doc. No. 41 at 36). At that point, he says he was "really wanting to . . . have Tom talk to the government about doing a plea deal." (Id.).

In 2016, Mr. Kendrick reached out to the government at Mr. Smith's behest to inquire about a plea deal. (Id.). The government responded, in June of that year, that it was "not prepared

6

to make any plea bargains at [that] time." (Ex. 20). Mr. Kendrick encouraged Mr. Smith "to hold out hope, that Jim Lynch was going to still be able to successfully get the case dismissed." (Doc. No. 41 at 39).

Later, Mr. Smith's trial date was continued multiple times. Mr. Kendrick moved for some of the continuances because the government was still providing him with new discovery, among other reasons. Edwards, et al., Case No. 3:13-cr-00012, ECF Nos. 277, 329, 350. In November 2017, he moved for a final continuance because he had pneumonia. Edwards, et al., Case No. 3:13-cr-00012, ECF No. 353. The continuance was granted, and the Court appointed "back-up counsel" for Mr. Kendrick. Edwards, et al., Case No. 3:13-cr-00012, ECF Nos. 354, 360.

In January 2018, the government extended a formal plea offer to Mr. Smith. (Ex. 17). The offer would have required Mr. Smith to agree to a proposed sentencing guideline range of 188–235 months of imprisonment. (Id.). Mr. Smith did not accept the offer. (Doc. No. 41 at 166–67).

Ultimately, in February 2018, Mr. Smith went to trial. Edwards, et al., Case No. 3:13-cr-00012, ECF No. 509. The jury found him guilty, and in July 2018, Mr. Smith was sentenced to 180 months of imprisonment. Edwards, et al., Case No. 3:13-cr-00012, ECF No. 427. Roughly a year later, Mr. Smith filed the instant action. (Doc. No. 1). Mr. Kendrick subsequently passed away on January 26, 2020. (Doc. No. 16-9 at 2). Accordingly, the Court was unable to receive his testimony during its evidentiary hearing.

B.    The Court's Credibility Determinations.

Because many of the claims Mr. Smith makes in his petitions rely solely on his hearing testimony for support, it is necessary for the Court to assess the credibility of that testimony. The Court did not find Mr. Smith believable, due to his tone and tenor, and for the following reasons.

Mr. Smith's hearing testimony contradicted his pro se petition. At the hearing, he said: "I don't recall [Ms. Thompson] ever giving me specific advice to plead guilty." (Doc. No. 41 at 63). In his pro se petition, he said: "The only legal advise [sic] that Ms. Thompson offered [me] was to take a plea." (Doc. No. 1 at 2).

Similarly, Mr. Smith's hearing testimony contradicted an affidavit he submitted with his pro se petition. In the affidavit, Mr. Smith said Mr. Kendrick "never tried to investigate or research any potential witnesses," including a man named Alan Clock. (Doc. No. 1-6 at 1). At the hearing, Mr. Smith testified that Mr. Kendrick spoke to multiple witnesses, including Mr. Clock. (Doc. No. 41 at 40 ("I know we got on the phone with [Mr. Clock] at one point."); see also id. at 33 (noting Mr. Kendrick "had come up and met with Agent West at one point," and that during his investigation, Mr. Kendrick discussed "different things he knew on -- on a couple of different witnesses that he thought -- specifically, Agent West, that he thought . . . didn't have any credibility")).

Additionally, Mr. Smith's hearing testimony contradicted notes he provided to Mr. Kendrick in 2012. At the hearing, Mr. Smith said he "knew that some of the vendors [Cumberland] had bought from were unlicensed." (Doc. No. 41 at 80). In his 2012 notes, Mr. Smith wrote that he "didn't know product was coming from unlicensed sources." (Ex. 13 at 6).

Finally, the exhibits submitted in this case tell a very different version of events than those described in Mr. Smith's testimony. Mr. Smith testified "I know I'm guilty" at the hearing. (Doc. No. 41 at 62). And he said he made that clear to Mr. Kendrick from the very beginning of their relationship. (Id. at 22–23). Yet, as outlined above, Mr. Kendrick's intake memorandum for Mr. Smith's case, and an email to one of his colleagues, indicate the opposite is true. (Exs. 23, 31).

8

## II.     LEGAL STANDARD

Courts evaluate ineffective assistance of counsel claims using the two-pronged test from Strickland v. Washington, 466 U.S. 668 (1984).  Under that test, a petitioner must show (1) his attorney rendered deficient performance, which (2) caused the petitioner prejudice.  Id. at 693–94.

The performance prong requires a petitioner to demonstrate his attorney's performance fell "below an objective standard of reasonableness."  Id. at 688.  This is no easy feat.  "[S]crutiny of counsel's performance must be highly deferential."  See id. at 689.  Courts must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  Further, they "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."  Id.  And they must recognize that the "standard to which an attorney is held is not that of the most astute counsel, but rather that of reasonably effective assistance."  O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir. 1994) (citation and quotation omitted).  Throughout, it is the petitioner's job to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Strickland, 466 U.S. at 690.

Notably, courts are especially hesitant to question the strategic choices made by counsel. See Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001) ("A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness."); Ray v. Holland, 230 F.3d 1359 (6th Cir. 2000) ("Valid trial tactics or strategy cannot form the basis for an ineffective assistance of counsel claim.").  Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.

9

To satisfy the prejudice prong, a petitioner must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of [the petitioner's] proceeding would have been different." Id. at 694. A reasonable probability is a "substantial, not just conceivable" likelihood of a different result. Harrington v. Richter, 562 U.S. 86, 112 (2011).

The Supreme Court outlined the standard for evaluating prejudice in the context of pleas in Lafler v. Cooper, 566 U.S. 156 (2012). There, the defendant alleged he suffered prejudice by "[h]aving to stand trial" instead of accepting a plea offer. Id. at 163–64. The Court explained that, in such circumstances, defendants must show "there is a reasonable probability . . . that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."[8] Id.

Finally, a petitioner must prove the "factual contentions" that support his claim by a preponderance of the evidence. Holland v. Jackson, 542 U.S. 649, 654 (2004).

## III. ANALYSIS

Mr. Smith argues he received ineffective counsel based on Mr. Kendrick's inadequate investigation, failures during the plea-bargaining stage, incompetent trial strategy, failure to

---

[8] Mr. Smith's arguments focus on his sentence, as opposed to his crimes of conviction (presumably because his goal is to reduce his sentence, not to change the labels associated with it). For that reason, the Court will only analyze whether Mr. Smith has shown a reasonable probability that he would have received a lighter sentence with effective counsel. However, the Court notes the offenses in the government's original plea offer (mail fraud and money laundering) differ somewhat from Mr. Smith's offenses of conviction (mail fraud, conspiracy to commit mail fraud, and obstruction of justice). If Mr. Smith wishes to file a new petition alleging he suffered prejudice in the form of more severe offenses of conviction, he may do so. The Court understands this may be of little solace to Mr. Smith given that such a petition, even if successful, likely could only yield a change in the labels associated with his sentence. See Lafler, 566 U.S. at 170 (noting that "Sixth Amendment remedies should be tailored to the injury suffered") (citation and quotation omitted).

10

challenge a search warrant, and failure to object to employment evidence.[9]  The Court finds that each of Mr. Kendrick's alleged errors either did not occur, did not constitute deficient performance, or did not prejudice Mr. Smith.  Accordingly, it will deny Mr. Smith's request for relief.

A.  Mr. Smith Has Not Established Mr. Kendrick Performed an Inadequate Investigation.

Mr. Smith claims Mr. Kendrick performed defectively during the investigatory stage of his case.  (Doc. No. 11 at 2, 8–11).  The Court disagrees.  The record shows that Mr. Kendrick conducted a reasonable investigation, and Mr. Smith has not raised contrary evidence.

*First*, the available evidence shows Mr. Kendrick conducted a sufficient investigation.  There is no bright-line rule for determining whether a given investigation was adequate.  See Strickland, 466 U.S. at 688–89.  However, finding that an attorney interviewed his client, interviewed other witnesses, reviewed discovery, and pursued evidence to support a defense theory generally will support a finding that the attorney adequately investigated his client's case.  See Jackson v. Warden, Chillicothe Corr. Inst., 622 F. App'x 457, 461 (6th Cir. 2015).  Mr. Kendrick's investigation checked each of these boxes.

Clearly, Mr. Kendrick interviewed Mr. Smith.  Mr. Smith admitted at the hearing that during his first meeting with Mr. Kendrick, they "really pored over every detail of the case."  (Doc. No. 41 at 21).  They discussed Mr. Smith's employment history, Cumberland, Mr. Smith's role

---

[9] In his original petition, Mr. Smith also argued he was "deprived of his protection against cruel and unusual punishment, created by [the] disproportionate sentence between himself and his co-defendants."  (Doc. No. 1 at 8).  But one's sentence does not "run[] afoul of the Eighth Amendment merely because it is disproportionate to the sentences received by others who committed the same or similar crimes."  United States v. Layne, 324 F.3d 464, 474 (6th Cir. 2003); see also Workman v. Burt, No. 2:06-CV-11129, 2008 WL 565466, at *3 (E.D. Mich. Feb. 29, 2008) ("The critical factor for a court in determining whether a sentence is so disproportionate as to constitute cruel and unusual punishment is whether the sentence is grossly disproportionate to the crimes, not whether the sentence is grossly disproportionate to that received by co-defendants.").

there, the Edwards, and the 2010 proffer session in which Mr. Smith had participated. (Id.; Ex. 31). Based on the meeting, Mr. Kendrick wrote a thorough client intake memorandum. (Ex. 31). Mr. Kendrick also asked Mr. Smith to follow-up on the meeting by providing notes regarding his 2010 proffer session. (Doc. No. 41 at 25–26).

Additionally, Mr. Kendrick interviewed potential witnesses. At minimum, he spoke to (1) Agent West; (2) David Brooks, the former CFO of Cumberland; (3) John Thayer, Cumberland's former Certified Public Accountant; (4) Craig Rohden, the CEO of a credit union that had held assets for Mr. Smith; and (5) Alan Clock, a possible expert witness. (Ex. 26; Doc. No. 41 at 40, 110). Mr. Kendrick was also aware of, and sought information related to, numerous other witnesses who he may have interviewed (though the record does not make clear whether he spoke to them). (See Ex. 26).

Further, Mr. Kendrick reviewed discovery. Early in the case, he met with Agent West to go over the evidence the government had collected. (Doc. No. 41 at 110–111, 116). He spent "three or four hours" examining the evidence and talking to Agent West. (Id. at 110). And he did not cease reviewing discovery after that. In a 2015 email exchange with the government, Mr. Kendrick raised "a number of discovery problems." (Ex. 26).

Notably, the evidence suggests Mr. Kendrick's review of discovery was quite thorough. He apparently noticed that the date on "a lab report that was a part of the discovery" was "before the . . . UPS shipping package came in." (Doc. No. 41 at 35). He shared his "discrepancy" with Mr. Smith because "he thought he could get that removed as evidence because of that error." (Id.). Further, in his correspondence with the government, Mr. Kendrick identified, and asked for, items he believed the government omitted from its discovery. (Ex. 26). At one point, he noted that he had already "searched the remote hard drive furnished by the previous AUSA" to resolve his

12

concerns, to no avail. (Id.). He then asked the government to provide witness statements and reports that he believed the government should have. (Id.).

Finally, Mr. Kendrick pursued leads supporting a defense theory during his investigation. Mr. Kendrick intended to create a reasonable doubt as to Mr. Smith's culpability, in part, by impeaching Agent West, who he believed "didn't have any credibility." (Doc. No. 41 at 33, 71). He apparently sought information to support this belief during his witness interviews. When he talked to Mr. Brooks, whom Agent West had interviewed, he learned Agent West had allegedly told Mr. Brooks that "he was going to make sure that [Mr. Smith] lost everything." (Ex. 26). Mr. Kendrick also spoke to another witness who apparently said Agent West was "threatening" and "rude" and had tried "to intimidate him." (Id.). Additionally, based on his belief that Agent West had "unlawfully disclose[d]" grand jury information, Mr. Kendrick asked the government to provide "the result of its investigation into [that] conduct." (Id.).

In sum: the evidence before the Court suggests Mr. Kendrick's investigation was reasonable and adequate.

*Second*, Mr. Smith does not sufficiently support his claim that Mr. Kendrick's investigation was inadequate. Mr. Smith avers Mr. Kendrick "never tried to investigate or research any potential witnesses." (Doc. No. 1-6 at 1). This statement is flatly contradicted by Mr. Smith's own hearing testimony and the exhibits submitted in this case, as outlined above. (Doc. No. 41 at 33; Ex. 26).

Next, Mr. Smith claims Mr. Kendrick was ineffective for failing to investigate five specific witnesses: Braden Fraley, Alex Hidalgo, David Brooks, John Thayer, and Alan Clock. (Doc. No. 1-6 at 1). But the record—including some of Mr. Smith's testimony—shows Mr. Kendrick did speak to at least three of those witnesses: Mr. Brooks, Mr. Thayer, and Mr. Clock. (Ex. 26; Doc. No. 41 at 40). And there is no reason to think Mr. Kendrick should have spoken to the remaining

13

two witnesses. They were individuals who could have testified about "the different roles that [Mr. Edwards] and [Mr. Smith] had as owners" of Cumberland. (Doc. No. 1-6 at 1). Mr. Kendrick already had access to that type of information through Mr. Smith. (See Ex. 31). His failure to seek out additional witnesses to provide generic background information does not render his investigation inadequate. See Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Finally, Mr. Smith argues Mr. Kendrick must have failed to "review and appreciate" certain evidence supplied by the government because, if he had done so, he would have known Mr. Smith would lose at trial and would have advised Mr. Smith to plead guilty. (See Doc. No. 11 at 2, 9–11). Mr. Smith provides a bullet-pointed list describing the "incriminating evidence" Mr. Kendrick ostensibly failed to adequately review. (Id. at 9–11). However, much of the list is quite vague and describes evidence Mr. Smith has not presented to the Court. (E.g., id. at 10 (alleging the government's discovery "documented many witnesses . . . with varying degrees of knowledge" of Mr. Smith's criminal activity)). This prevents the Court from assessing whether the evidence was truly as incriminating as Mr. Smith implies. (Id.). Further, the list does not describe *when* the government supplied Mr. Kendrick with each piece of evidence. (Id. at 9–11). Without that information, the Court cannot accurately judge the reasonableness of Mr. Kendrick's conduct "at the time" of that conduct, as required.[10] Strickland, 466 U.S. at 689.

An example illustrates the Court's conundrum. If Mr. Kendrick received a pile of truly

---

[10] In recognition of the imperfect record before the Court, the Court is denying Mr. Smith's petition without prejudice. Mr. Smith may refile if he can raise evidence, aside from his own post-conviction testimony and written statements, that undermine the Court's findings. Mr. Smith may not refile solely based on his own post-conviction testimony or written statements because the Court deems him a non-credible witness. Supra Section I.B.

incriminating evidence before June 2016, when the government said it was unwilling to entertain plea negotiations, that *might* support Mr. Smith's argument that Mr. Kendrick should have advised him to pursue a plea. (Ex. 20). However, if Mr. Kendrick did not receive incriminating evidence until after June 2016,[11] it is easy for the Court to see why Mr. Kendrick would not have advised Mr. Smith to pursue a plea. To wit: requesting a plea would have been futile.

Because Mr. Smith's list omits critical information, it amounts to "bare allegations" that Mr. Kendrick's investigation was inadequate. Vernon v. Williams, 208 F.3d 228 (10th Cir. 2000). That "fall[s] far short of establishing an ineffective assistance of counsel claim." Id.; see also Higgins v. Renico, 470 F.3d 624, 632 (6th Cir. 2006) ("When complaining of his counsel's deficient performance . . . a defendant has the burden of proving, by a preponderance of the evidence, that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'") (quoting Strickland, 466 U.S. at 687)).

B.     Mr. Smith Has Not Established Mr. Kendrick Performed Deficiently During the Plea-Bargaining Stage of His Case.

Mr. Smith also contends he received ineffective assistance during the plea-bargaining stage of his proceedings. He claims Mr. Kendrick was unreasonably opposed to pursuing a plea deal and presented Mr. Smith with an unrealistically optimistic view of the strength of his case. (Doc. No. 11 at 2, 7, 15). The Court focuses its analysis of these alleged errors on the time before the government rejected Mr. Smith's request for plea negotiations in June 2016. (Ex. 20). After that point, there is no reasonable probability the government would have offered a plea with terms "less severe than under the judgment and sentence that in fact were imposed," regardless of Mr.

---

[11] Importantly, as outlined in Section III.B, the record suggests Mr. Kendrick *did not* have access to clearly incriminating evidence before June 2016.

Kendrick's alleged errors.[12] Lafler, 566 U.S. at 163–64. The Court finds neither the record nor the law support Mr. Smith's argument that Mr. Kendrick was ineffective during the plea-bargaining stage.

*First*, the available evidence does not show Mr. Kendrick was unflinchingly opposed to plea agreements, as Mr. Smith suggests in his briefs. (E.g., Doc. No. 11 at 8 (claiming Mr. Kendrick "advised, from the earliest stages of his representation, that Mr. Smith should reject any and all plea negotiations")). Mr. Smith admitted at the hearing that he and Mr. Kendrick had a post-indictment "discussion" about how they "could try looking at doing a plea deal." (Doc. No. 41 at 30). At the end of the discussion, Mr. Kendrick said: "We've got some time on our side. Let's not make any decisions right now. Let's just think about [that]." (Id. at 31). Further, when Mr. Kendrick emailed Mr. Smith the government's January 2018 plea offer, he said "I think this is way out there. We may need to discuss counter offer." (Ex. 17). The record shows Mr. Kendrick was open to plea agreements, even if he did not consider them his top priority.

*Second*, the record does not support Mr. Smith's argument that Mr. Kendrick presented a blindly optimistic opinion about the strength of his case. According to Mr. Smith's briefs, Mr. Kendrick assured him he could succeed at trial, get his case dismissed, or receive only a misdemeanor. (Doc. No. 11 at 2, 7). But Mr. Smith's hearing testimony told a different story. Mr. Smith testified that, during their post-indictment discussion, Mr. Kendrick "went over the . . . sentencing guidelines for each charge." (Doc. No. 41 at 30). Then Mr. Kendrick talked about the possibility of a plea deal. (See id.). He said the "best-case scenario" would be "a misdemeanor charge for . . . the count of obstruction of justice." (Id.). The "[w]orst-case scenario" would be a

_____

[12] The only offer the government made after that point was a deal with a proposed sentencing range of 188–235 months. (Ex. 17). That range is higher than the sentence Mr. Smith ultimately received: 180 months. Edwards, et al., No. 3:13-cr-00012, ECF No. 427.

"maximum of 20 years" on "the mail fraud charges." (Id.). And "somewhere in that range he thought [they] could negotiate . . . some type of a plea deal." (Id.). Mr. Smith's admission that Mr. Kendrick contemplated, and discussed, a worst-case scenario of a 20-year sentence and a reasonable range within which a plea agreement might fall undermines his argument that Mr. Kendrick was unrealistically optimistic about his case.[13]

Third, even if Mr. Kendrick was opposed to a plea and presented an optimistic view about Mr. Smith's case before June 2016, that was not objectively unreasonable. The government was still providing Mr. Kendrick with new discovery after June 2016. Edwards, et al., Case No. 3:13-cr-00012, ECF No. 277. The Court must presume the discovery Mr. Smith received up until that point provided a reasonable basis for the strategic judgments he made, absent contrary evidence. Burt v. Titlow, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'") (citation omitted). Mr. Smith has not presented contrary evidence. As noted, he has not shown what the government's discovery contained or when Mr. Kendrick received any allegedly "incriminating" pieces of discovery. Supra Section III.A.

Indeed, the record suggests Mr. Kendrick did not have clearly incriminating evidence before June 2016. Mr. Smith told Mr. Kendrick he "at no time had any knowledge that anything

---

[13] As for Mr. Smith's claim that Mr. Kendrick's strategy of trying to get his case dismissed was unreasonable (Doc. No. 1 at 3): the Court disagrees. Courts must recognize there "are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. Further, in "judging the reasonableness of an attorney's investigation and of the strategic decisions that followed from that investigation, one factor to be considered is the experience of the attorney." Spaziano v. Singletary, 36 F.3d 1028, 1040 (11th Cir. 1994). Here, Mr. Kendrick's experience, apparently, gave him reason to believe he could get Mr. Smith's case dismissed. Mr. Smith testified that his family knew clients of Mr. Kendrick who had gotten their cases dismissed. (Doc. No. 41 at 34). And he testified that Mr. Lynch "had had success in other cases that he had worked with Tom Kendrick." (Id.).

was wrong about the business dealings of Cumberland." (Ex. 31 at 4). And Mr. Smith had sent Mr. Kendrick notes disputing that he made the statements Agent West attributed to him from the 2010 proffer. (Ex. 13). Based on this information, Mr. Kendrick might reasonably have believed his client lacked the intent to commit the crimes of which he was charged. Strickland, 466 U.S. at 691 (attorneys may "quite properly" rely on "information supplied by the defendant" in their investigations).

Next, Mr. Kendrick had information from his meeting with Agent West. (Doc. No. 41 at 110). During it, he had an opportunity to assess Agent West's credibility, which he ultimately concluded was lacking. (See id. at 33, 110). And he also reviewed the evidence the government had collected. (Id. at 110). At the time, this consisted of the "counterfeit drugs that [the government] seized from the warehouses, the counterfeit labels, [and] the counterfeit inserts." (Id.). In other words: it appears the evidence implicated Cumberland in wrongdoing but not necessarily Mr. Smith.

Further, Mr. Kendrick had evidence collected from witnesses he interviewed. (See Ex. 26). He believed at least one of those witnesses had provided "clearly exculpatory" information. (Id.). And as of October 2015, at least, he was waiting for the government to turn over certain witness statements "[t]o the extent any of them arguably contain[ed] Brady material." (Id.).

True, Mr. Kendrick knew that Agent West, and the Edwards, might testify against Mr. Smith if the case went to trial. (Doc. No. 41 at 43; Exs. 2, 4). And he knew about the summaries of Mr. Smith's proffers. (Exs. 2, 4). But these summaries, and any testimony from Agent West, relied upon Agent West's credibility, which Mr. Kendrick deemed to be low. (Doc. No. 41 at 33). Similarly, the Edwards' testimony would rely upon their credibility. They likely could have been impeached given they stood to benefit from testifying against Mr. Smith. (See id. at 43 (noting

18

that, pretrial, Mr. Kendrick discussed how he "was going to try to . . . question [the Edwards'] credibility" if the case went to trial)).

Mr. Kendrick also knew another witness, Jorge Castillo, might testify against Mr. Smith. Edwards, et al., Case No. 3:13-cr-00012, ECF No. 231. The government filed a notice of its intent to introduce Mr. Castillo's testimony under Federal Rule of Evidence 404(b) in December 2015. Id. The notice stated that Mr. Castillo could provide information about Mr. Smith's employment at Midwest Pharmacy ("Midwest") between 2005 and 2007 (before Mr. Smith co-founded Cumberland). Id. at 3. Specifically, Mr. Castillo could testify that Mr. Smith "was the CFO of Midwest when Castillo . . . began selling diverted prescription drugs to Midwest" and that Mr. Smith "knew that the drugs . . . were diverted drugs." Id. at 4. The government claimed Mr. Castillo's testimony would undermine any "defense of mistake" Mr. Smith might raise. Id. at 6.

However, Mr. Kendrick reasonably might have discounted the danger posed by Mr. Castillo's testimony on several grounds. First, the summary of Mr. Castillo's statement, which was attached to the government's notice, indicated Mr. Castillo had *circumstantial* evidence of Mr. Smith's knowledge of illegality; it does not appear to foreclose a defense of lack of intent. Edwards, et al., Case No. 3:13-cr-00012, ECF No. 231-1 at 2 ("Castillo stated Jerrod Smith . . . knew that Castillo was dealing in diverted drugs solely based upon the percentage off of WAC [wholesale acquisition cost] that Castillo sold at. Castillo stated that prices 10% off of WAC or higher were obvious signs that the drugs were problematic."). Second, the summary included some information that might support Mr. Smith's claim that the Edwards—not Mr. Smith—were the true culprits in the Cumberland drug conspiracy. Id. ("Castillo stated the Edwards were supplying paper trail documentation to Midwest to give the appearance that Midwest was purchasing from legitimate sources."). Third, shortly after filing its notice, the government

19

admitted that the Edwards had informed it that part of Mr. Castillo's statement "was not accurate." Edwards, et al., Case No. 3:13-cr-00012, ECF No. 245-4.  So, Mr. Kendrick may have thought Mr. Castillo would be impeachable or that the government would not call him as a witness for fear of contradicting the Edwards.  If he suspected the latter, he was at least partially correct: the government did not call Mr. Castillo at trial.  Edwards, et al., Case No. 3:13-cr-00012, ECF No. 380.  Fourth, Mr. Kendrick may have thought he could prevent the admission of Mr. Castillo's testimony on evidentiary grounds (he later argued the testimony was inadmissible in a pretrial brief).  Edwards, et al., No. 3:13-cr-00012, ECF No. 366 at 2–3.

For the foregoing reasons, Mr. Smith has not overcome the strong presumption that Mr. Kendrick's strategic decisions during the plea-bargaining stage were reasonable.[14]

---

[14] There remains an evidentiary "loose end" regarding the information Mr. Kendrick had early in the case. Ms. Thompson testified she sent materials to Mr. Kendrick, including a "transcript" her office "typed up" based on a recording she made of Mr. Smith's proffer session. (Doc. No. 41 at 146).  She said the transcript was "not great," but it described "what was said in the proffer." (Id. at 153).  If the transcript included statements from Mr. Smith making clear he knew he had been involved in illegal activity, and Mr. Kendrick received the transcript, that might support Mr. Smith's argument that Mr. Kendrick should have advised him to plead guilty.  However, it appears the "not great" transcript did not include such statements (assuming Mr. Kendrick received it). The Court must presume Mr. Kendrick conducted a reasonable investigation into the transcript. Webb v. Mitchell, 586 F.3d 383, 395 (6th Cir. 2009).  After this investigation, he believed Agent West did not have any credibility and believed Mr. Smith was innocent.  (Doc. No. 41 at 33; Ex. 23 (Mr. Kendrick said, in a 2018 email to back-up counsel, "I also have a client who it appears was duped and did not know of the facts which would constitute a crime")).  This suggests Mr. Kendrick did not have a transcript that reinforced Agent West's version of the proffer session. (Ultimately, the Court can only speculate about the content of the transcript because it has not been produced. This significantly hampers any argument Mr. Smith could make based on the transcript. See Webb, 586 F.3d at 395 (petitioner who alleged trial counsel was ineffective for hiring an expert whose report could have been damaging during mitigation could not "overcome 'the strong presumption' that his trial counsel conducted a reasonable investigation" where the petitioner never produced the report) (citation and quotation omitted); see also Burt, 571 U.S. at 22–23 ("[T]he burden to 'show that counsel's performance was deficient' rests squarely on the defendant.") (citation and quotation omitted).)

20

C.  Mr. Kendrick's Alleged Failure to Develop a Competent Trial Strategy Did Not Prejudice Mr. Smith.

Mr. Smith argues he was denied effective counsel based on Mr. Kendrick's incompetent trial strategy. (Doc. No. 11 at 7). The strategy was to argue Mr. Smith "lacked the intent to commit the conviction offenses." (Id.). Mr. Smith claims this strategy was "untenable" because there was "copious evidence . . . sufficient to demonstrate Mr. Smith's guilt at trial." (Id. at 3). Mr. Smith lists the "testimony of his co-defendants and other employees with considerable knowledge of Cumberland's business" and the "documentary evidence from [the] investigation from the FDA," among other things, as the damning evidence that was present in his case. (Id. at 7).

Mr. Smith's argument is self-defeating. If there was "copious evidence" of his guilt, then Mr. Smith cannot show prejudice without identifying how a competent attorney could have successfully combatted that evidence. See Manley v. Ross Corr. Inst., 314 F. App'x 776, 786 (6th Cir. 2008) ("Notwithstanding the fact that Manley's attorney acted deficiently . . . we conclude that, against the overwhelming evidence of guilt, his substandard performance did not prejudice Manley's case."); Vincent v. United States, 902 F.2d 1570 (6th Cir. 1990) (no prejudice where there was "overwhelming" evidence of guilt). He has not done so.

D.  Mr. Kendrick's Failure to Challenge a Search Warrant Did Not Prejudice Mr. Smith.

Mr. Smith also contends he was denied effective counsel because Mr. Kendrick failed to challenge a warrant issued for the search of a Cumberland warehouse. (Doc. No. 11 at 17). He says a challenge to the warrant would have been successful because "[t]he Government presented insufficient probable cause to the Magistrate to allow the issuance of [the] warrant." (Id.). He avers Mr. Kendrick's failure to challenge the warrant caused prejudice because, absent the warrant, "the Government would have been unable to use the plethora of evidence obtained and presented

21

at trial." (Id.).

Mr. Smith's argument fails because there is no reasonable probability a challenge to the warrant would have been successful. To determine whether probable cause supports a warrant, a magistrate "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

Here, the affidavit reviewed by the Magistrate Judge was 17 pages long. (Doc. No. 11-1 at 21–37). It was written by an FDA agent, and it described an investigation into Cumberland. (Id.). The affidavit indicated that five bottles of Zyprexa sold by Cumberland at 1419 Donelson Pike in Nashville (the address of the Cumberland warehouse) were suspected to be "counterfeit." (Id. at 27). An analysis of the bottles had shown that one bottle "contained 20mg tablets even though the label stated that the bottle contained 10mg strength tablets," three bottles had package inserts that were outdated and appeared to have been tampered with, and one bottle had a "reproduced package insert" affixed to it. (Id. at 27–28). Based on this information, there was a "fair probability" that evidence of a crime would be found at the Cumberland warehouse. Gates, 462 U.S. at 238. Accordingly, there is no reasonable probability a challenge to the warrant to search that warehouse would have been successful, meaning Mr. Smith was not prejudiced by Mr. Kendrick's failure to raise such a challenge.

E.      Mr. Smith's Argument that Mr. Kendrick Prejudiced Him by Failing to Object to the Admission of Employment Evidence Fails.

Finally, Mr. Smith contends Mr. Kendrick was ineffective for failing to object to the government's introduction of employment evidence "about Mr. Smith's involvement with a prior pharmaceutical company, Midwest Pharmacy, that was investigated by the FDA and law

22

enforcement in the years immediately preceding the launch of Cumberland." (Doc. No. 11 at 20). This argument misses the mark. Although Mr. Kendrick did not file an opposition directly to the government's original notice of its intent to introduce the employment evidence, he did argue that evidence was inadmissible in a pretrial brief. Edwards, et al., No. 3:13-cr-00012, ECF No. 366 at 2–3. To the extent Mr. Smith implies Mr. Kendrick's failure to object directly to the government's original notice constituted ineffective assistance, Mr. Smith has failed to show he was prejudiced by that failure given Mr. Kendrick's argument in his pretrial brief.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Smith's petitions (Doc. Nos. 1, 11) are **DISMISSED WITHOUT PREJUDICE**.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE